[Cite as *In re D.T.*, 2021-Ohio-1650.]

STATE OF OHIO              )          IN THE COURT OF APPEALS
                          )ss:        NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT          )

IN RE: D.T.                           C.A. No.     29876
      M.T.


                                      APPEAL FROM JUDGMENT
                                      ENTERED IN THE
                                      COURT OF COMMON PLEAS
                                      COUNTY OF SUMMIT, OHIO
                                      CASE Nos.   DN 16 12 1027
                                                  DN 16 12 1028

DECISION AND JOURNAL ENTRY

Dated: May 12, 2021

HENSAL, Presiding Judge.

{¶1}    Appellant Father appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed the children D.T. and M.T. in the permanent custody of appellee Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2}    Mother and Father are the biological parents of D.T. (d.o.b. 10/29/12) and M.T. (d.o.b. 9/21/15). The parents were married but divorced during the pendency of the case. Based on domestic violence in the home, CSB filed complaints alleging that both children were abused and dependent. Mother and Father waived their rights to an adjudicatory hearing and stipulated that D.T. and M.T. were dependent children. The agency dismissed its allegations of abuse. Mother and Father again waived their rights to a hearing on disposition. They agreed to the placement of the children in the temporary custody of CSB and to the adoption of the agency's

case plan as the order of the court. The juvenile court found that the agency had made reasonable efforts to prevent the continued removal of the children from the home at both the adjudicatory and dispositional hearings.

{¶3} As to the initial case plan, while Mother was required to obtain a mental health assessment and participate in services with various providers, "all family members" were required to participate in counseling at a mental health facility, as well as in-home counseling and/or case management services designed to address domestic violence, anger management, family conflicts, parenting struggles, and child discipline and behavioral issues, with the goal of individual safety. In addition, "all family members" were required to acknowledge how each might contribute to solving the family's issues, apply the skills and knowledge learned while interacting, and follow all therapeutic recommendations to enhance family functioning. Both parents were required to demonstrate the ability to meet the basic needs of the children relating to food, clothing, shelter, medical care, love, and guidance.

{¶4} In addition, Father had an individual objective related to addressing his criminal issues. Specifically, he was required to attend all his criminal hearings, comply with all court orders and directives from his probation officer, and update CSB regarding his status and progress. Father was obligated to comply with all rules of his probation, including reporting, participating in anger management classes, submitting to 90 days of electronic home monitoring, and providing random urine drops for drug screening. Within two months, the case plan was amended to add a requirement for Father to engage in an intensive anger management/domestic violence program at Summit Psychological Associates based on his probation officer's directive. No party opposed this case plan amendment and the juvenile court adopted it as an order.

{¶5} During the fourteen months after the initial disposition, the juvenile court conducted four review hearings, consistently finding that CSB had used reasonable efforts to prevent the children's continued removal from their parents. Although Mother and Father had both filed motions for legal custody, the parents withdrew them and agreed to a first six-month extension of temporary custody. In the interim, the agency investigated the children's maternal grandmother for placement. That home could not be approved, however, because of unresolved issues with bed bugs. When Mother and Father failed to make adequate progress on their case plan objectives, CSB filed a motion for permanent custody. After a hearing, the juvenile court denied the agency's motion and granted the parents' motion for a second six-month extension of temporary custody. Although the juvenile court found that the agency had continued to use reasonable efforts to facilitate the children's return home, it noted that the case plan had not been amended as necessary to include substance abuse and parenting assessments for both parents.[1]

{¶6} CSB filed an amended case plan, adding the objectives identified by the juvenile court. Mother and Father both signed the amended case plan, and no party filed objections to it. Although the juvenile court failed to issue an order noting the absence of any objections and adopting the amended case plan as the order of the court, it became operative pursuant to statute. *See* R.C. 2151.412(F)(2)(b) (allowing the agency to implement an amended case plan in the absence of objections and court order 15 days after filing of the amended case plan).

{¶7} Prior to the sunset dispositional hearing, Mother filed a motion for legal custody, or alternatively, legal custody to the maternal grandmother. Father filed a motion for legal custody, or alternatively, joint legal custody with Mother. CSB did not file a motion, but the assistant

---

[1] A prior order by the magistrate had ordered Father to complete a substance abuse assessment and follow all treatment recommendations, however.

prosecutor represented at the hearing that the agency supported Mother's alternative motion for legal custody to the maternal grandmother. The guardian ad litem did not support any pending motion for custody. Based on the evidence adduced at the hearing, the juvenile court denied all pending motions after finding that no proposed dispositions were in the best interest of the children. The court ordered CSB to file an appropriate dispositional motion forthwith.

{¶8} CSB filed a second motion for permanent custody. Pending hearing on its motion, the agency twice moved to suspend Father's visitation based on concerning disclosures by the children. The juvenile court ultimately denied both motions, finding that allegations of impropriety by Father during closely supervised visits at the agency's visitation center were not credible. Subsequently, Father moved to increase his visitation with the children. As Father failed to appear at the pretrial regarding his motion, however, the juvenile court denied it.

{¶9} Father filed a motion for legal custody, or alternatively, a third six-month extension of temporary custody. Mother filed a motion to voluntarily relinquish her parental rights regarding D.T. and M.T. CSB filed another amended case plan, adding express requirements based on the recommendations arising out of Father's recently completed parenting evaluation.

{¶10} After accepting Mother's voluntary surrender of her parental rights, the juvenile court held its final dispositional hearing. The trial court denied Father's alternative motions, granted CSB's motion for permanent custody, and terminated all parental rights. Father filed a timely appeal in which he raises two assignments of error for review. Based on the nature of Father's arguments, this Court consolidates the assignments of error for discussion.

II.

**ASSIGNMENT OF ERROR I**

**THE [ ] JUVENILE COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF [ ] D.T. AND M.T. TO [CSB]. [CSB] DID NOT MEET ITS**

**BURDEN OF PROOF AND THE AWARD OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT COMMITTED REVERSIBLE ERR[OR] WHEN IT GRANTED PERMANENT CUSTODY TO [CSB], TERMINATED FATHER'S [PARENTAL] RIGHTS AND PLACED THE CHILDREN IN THE PERMANENT CUSTODY OF [CSB] WHEN THE AGENCY DID NOT PROVIDE REASONABLE REUNIFICATION EFFORTS.**

{¶11} Father argues that the juvenile court's award of permanent custody of the children to CSB was against the manifest weight of the evidence. In significant part, he argues that his substantial compliance with case plan objectives and continued desire for reunification warranted denial of the agency's motion. This Court disagrees.

{¶12} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶13} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under Revised Code Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the

child, based on an analysis under Section 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the children, the wishes of the children, the custodial history of the children, the children's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in Section 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶14} Father does not challenge the juvenile court's first-prong finding that the children were in the temporary custody of CSB in excess of 12 months during the prior consecutive 22-month period. The record supports this finding. Accordingly, the juvenile court's finding that CSB proved its first-prong allegation was not against the manifest weight of the evidence. As Father challenges only the juvenile court's finding that permanent custody was in the best interest of the children, this Court so limits our analysis.

{¶15} When a juvenile court grants an agency's motion for permanent custody in lieu of any pending motion for legal custody, this Court applies the following test:

> Because the trial court's decision whether to place the children in the legal custody of [any person] was also based on the best interest of the children, "this Court typically conducts a single 'best interest' review of the trial court's decision to place the children in the permanent custody of the agency rather that in the legal custody to a relative." *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10, quoting *In re T-G.M.*, 9th Dist. Summit No. 25858, 2011-Ohio-3940, ¶ 13. If permanent custody is in the children's best interest, legal custody to [any other person] necessarily is not. "'Consequently, this Court will review the factors set forth in [Section] 2151.414(D) in reviewing the best interest decision of the trial court * * *'" *Id.*

*In re S.P.*, 9th Dist. Summit No. 27138, 2014-Ohio-1211, ¶ 10.

Custodial history of the children

{¶16} D.T. and M.T. resided with Father and Mother from birth until they were removed by CSB at the respective ages of four years and 14 months old and placed in foster care. The original foster family requested an alternative placement for the children based on behavioral issues. D.T. and M.T. have been residing together in their current therapeutic foster home for more than three years. Although the maternal grandmother appeared to be a viable placement option for the children, her home ultimately could not be approved based on her inability to rid her home of bed bugs.

Interactions and interrelationships of the children

{¶17} The children are closely bonded with one another and all members of the foster family. Although the children were initially violent toward people and animals in the foster home, those tendencies have generally abated. M.T. continues to exhibit some aggression immediately prior to and following visits with Father, but the foster parents, in conjunction with professionals, have worked with him to establish calming techniques. D.T. still struggles to make friends, but her aggression toward classmates has decreased. Instead, when anxious, the child becomes timid.

{¶18} The children have had no contact with Mother since she voluntarily relinquished her parental rights. Father has attended every visit except one throughout the case, even attending Mother's scheduled visits when she has failed to appear. The children greet Father pleasantly but separate from him easily at the end of visits. M.T. behaves aggressively at every visit, often physically attacking Father, case aides, and the guardian ad litem. Although Father puts M.T. in at least one time out per visit, the child physically challenges Father during those times, often

hitting or biting him. D.T. is left to engage in solo activities when Father is trying to redirect M.T. D.T. describes the visits with Father as "bad."

{¶19} Both children exhibit severe anxiety immediately prior to visits with Father. They engage in self-harm, picking their fingers until they bleed, during the drive to the visitation center. They have unbuckled themselves from their car seats during the ride to delay or avoid attending the visit. The foster mother testified that the children do not again begin to calm down until they have left the city where visits take place. Both children have consistently indicated that they do not want to visit with Father.

Children's wishes

{¶20} Both D.T. and M.T. have expressed their desire to remain with the foster parents. The guardian ad litem opined that it is in the children's best interest to be placed in the permanent custody of CSB for purposes of adoption.

Children's need for permanence

{¶21} D.T. and M.T. were routinely exposed to domestic violence between Father and Mother. Both children have exhibited extreme aggression, and D.T. has been diagnosed with post traumatic stress disorder. D.T. has seriously abused animals and acted out violently toward classmates and people in her various homes. M.T. has similarly been physically aggressive with others, including service providers, foster parents, and other children in the foster home. With case management services through The Twelve of Ohio, as well as counseling and reinforcement in the foster home, both children have worked to develop coping skills. D.T. has started to help caring for the multiple dogs in the foster home instead of trying to harm them. Both children have settled into a routine with their foster family and have worked hard to manage their emotions and quell tantrums and aggressive behaviors. D.T. and M.T. relapse into anxious aggression or

withdrawal, however, immediately before visits with Father and for about a day afterwards until they can resume greater emotional stability.

{¶22} Both children have adamantly expressed the desire not to visit with Father. In addition, both have disclosed information to counselors and service providers about Father which have caused concerns. For example, M.T. has reported that Father encourages their aggression so that they might be removed from the foster home. D.T. has reported that Father directed her not to discuss certain matters and events with anyone.

{¶23} Father's initial case plan objectives dealt with resolving his criminal cases and complying with rules of probation which focused on anger management issues. Based on issues that became evident during the case, CSB added case plan objectives requiring Father to obtain various assessments, including for parenting, mental health, and substance abuse. Based on the results of those assessments, Father was required to participate in additional services.

{¶24} Father scheduled and appeared for his appointments for assessments, counseling, and educational services. He argues that he did everything that CSB required and substantially complied with his case plan objectives. It is well settled that, while a parent's compliance with case plan objectives may be relevant to the children's best interest, it is not dispositive of the issue. *In re K.H.*, 9th Dist. Summit No. 29555, 2020-Ohio-776, ¶ 12, citing *In re G.L.S.*, 9th Dist. Summit No. 28874, 2018-Ohio-1606, ¶ 20, and *In re G.A.*, 9th Dist. Summit Nos. 28664 and 28665, 2017-Ohio-8561, ¶ 13.

{¶25} Father was diagnosed with antisocial personality disorder; severe alcohol and cannabis use disorders; and severe amphetamine-type substance use disorder, provisional. During his various psychological assessments and counseling sessions, Father habitually minimized and even failed to disclose many of his issues with anger, violence, substance use, and criminal history.

Accordingly, while he engaged in counseling with multiple providers, he was terminated within a handful of sessions each time because he did not admit he had any issues to address. Nevertheless, he continued to use and test positive for amphetamines. Moreover, while he completed three anger management courses, including a 10-week course, an intensive 10-week course, and an intensive 26-week course, he continued to be physically violent with intimate partners. In fact, after completing all three courses, he was charged and convicted during the case with an offense of violence against his girlfriend.

{¶26} The parenting assessor recommended that Father participate in parenting education based on his lack of understanding regarding developmental stages of children in general, as well as the mental health and medical histories and treatments of D.T. and M.T. specifically. The parenting assessor was greatly concerned that Father would not seek or continue necessary treatments or services for the children based on Father's demonstrated lack of understanding of the significance of his own recent injuries. Specifically, Father had fallen into a bonfire after drinking heavily. Although he suffered second and third degree burns, Father did not seek medical attention for almost a week.

{¶27} Father denied that the children had any behavioral problems. He did participate in parenting education, however. Nevertheless, he remained unable to effectively address M.T.'s aggressive behaviors during each visit. Although Father did not become violent with either child, and used time outs to address M.T.'s aggression, the child remained defiant and his aggression escalated during time outs, especially when Father physically restrained the child.

{¶28} Based on Father's substance abuse assessment, he was directed to participate in substance abuse treatment. He failed to participate in any such services. While he attended mental health counseling appointments as recommended, he was not forthcoming with providers and was

terminated. Father's counselors, caseworkers, and the guardian ad litem all believed that Father lacked insight regarding his mental health, substance abuse, and domestic violence issues which underlay the children's removal from their parents' home.

{¶29} Father independently sought out services from the Man to Man Fatherhood Initiative and the Battered Women's Shelter. Although both men who worked with Father found him cooperative and responsive, neither was aware of significant issues like Father's substance abuse or the extent of his criminal history and recent involvement in domestic violence. Father admitted that he sought such counseling solely to be finished with his case plan objectives which he did not recognize as being targeted on his anger and violence.

{¶30} The foster mother testified that she would not discuss whether she and her husband were willing to adopt the children because she did not want that to be a deciding factor for the juvenile court. She asserted, however, that her family would provide a home for both children as long as necessary.

{¶31} The guardian ad litem opined that permanent custody was the only viable custodial option for the children. She opined that Father did not recognize the trauma his actions inflicted on the children and that he had not internalized anything he had learned in any parenting or anger management course. Accordingly, the guardian ad litem did not believe that Father could provide a legally secure placement for the children. Mother and Father gave the caseworker no names of relatives or friends who might be considered for placement except for the maternal grandmother who was investigated and determined not to be a viable option.

Section 2151.414(E)(7)-(11) factors

{¶32} None of the statutory factors are implicated as to Father.

Conclusion

{¶33} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by terminating the parents' parental rights and awarding permanent custody to CSB. Mother voluntarily relinquished her parental rights. Father was unable to demonstrate that he recognized the significance of his substance abuse, mental health, and domestic violence issues and their impact on his ability to provide a safe and stable home for the children.

{¶34} Although Father engaged in various services, including three anger management courses, counseling, and mentoring, he continued to use illegal drugs and commit acts of intimate partner violence. He demonstrated no ability to mitigate the children's behavioral issues. Notwithstanding his consistent visits with the children, neither child developed any affinity for Father. Instead, both D.T. and M.T. expressed great anxiety at the prospect of seeing Father, as well as the ongoing desire not to visit with him.

{¶35} Father's actions were a major source of enduring trauma for the children. Nevertheless, Father minimized his role and failed to make any strides in recognizing their impact and modifying his behaviors. The children's behaviors have improved greatly as the foster family has engaged professionals and implemented their recommended techniques to help the children self-soothe without violence. Under these circumstances, the juvenile court's finding that it was in the children's best interest to terminate parental rights and award permanent custody to CSB is supported by clear and convincing evidence. As such, an award of legal custody to Father was not in the children's best interest. *See In re S.P.* at ¶ 10. Accordingly, the judgment is not against the manifest weight of the evidence.

{¶36} To the extent that Father's argument can be construed as a challenge to CSB's use of reasonable efforts to facilitate reunification, the argument fails. It is well settled that Section

2151.419, addressing reasonable efforts determinations, "imposes no requirement for such a determination at the time of the permanent custody hearing unless the agency has not established that reasonable efforts have been made prior to that hearing." (Internal quotations omitted.) *In re L.R.*, 9th Dist. Summit Nos. 29266 and 29271, 2019-Ohio-2305, ¶ 14, quoting *In re A.C.-B.*, 9th Dist. Summit Nos. 28330 and 28349, 2017-Ohio-374, ¶ 22; *see also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 41-43 (concluding that a reasonable efforts determination is necessary at a permanent custody hearing only if the agency has not demonstrated its use of reasonable efforts prior to that time).

{¶37} In this case, the juvenile court found that CSB had used reasonable efforts to prevent the continued removal of the children from their home at every hearing mandated by statute. At no time did either parent challenge those findings. Accordingly, in the absence of any prior objections or motions to set aside, Father has forfeited any challenge to CSB's use of reasonable efforts, save for a claim of plain error. *In re L.R.* at ¶ 18. *See also* Juv.R. 40(D)(3)(b)(iv). Father has not alleged plain error. Moreover, as he failed to provide this Court with transcripts from any prior hearings at which reasonable efforts were established, we presume regularity with regard to those determinations. *In re L.R.* at ¶ 18, citing *In re S.D.*, 9th Dist. Lorain Nos. 15CA010864 and 15CA010867, 2016-Ohio-1493, ¶ 25.

{¶38} Finally, to the extent that Father's argument can be construed as a challenge to the agency's proper implementation of case plan objectives, it is not well taken. CSB developed an original and multiple amended case plans containing detailed objectives for Father. All case plans were expressly adopted by the juvenile court with the exception of one, which became effective by operation of law pursuant to Section 2151.412(F)(2)(b). Father obtained additional assessments and engaged in further services without objections. In fact, Father independently sought guidance

from providers beyond those recommended by CSB. As previously discussed, however, despite participation in a range of services, Father was never able to demonstrate an understanding of the impact of his issues on the family or the ability to avoid behaviors which led to the initial removal of the children. For the above reasons, Father's first and second assignments of error are overruled.

III.

{¶39} Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, J.
SUTTON, J.
<u>CONCUR</u>

<u>APPEARANCES:</u>

DAVID M. LOWRY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACUQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.